**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KEVIN VALENTINE**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 10 C 1234 |
| v. | ) | |
| | ) | Magistrate Judge |
| **MICHAEL J. ASTRUE**, | ) | Martin Ashman |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kevin Valentine ("Plaintiff") seeks judicial review of a final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying

Plaintiff's application for Supplemental Security Income benefits ("SSI") under Title II of the

Social Security Act.  Before this Court is Plaintiff's Motion for Summary Judgment.  The parties

have consented to have this Court conduct any and all proceedings in this case, including entry

of final judgment.  28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c).  For the reasons discussed below, the

Court finds that Plaintiff's motion is denied.

### I.    Procedural History

Plaintiff filed an application for SSI on April 12, 2004, alleging that he became disabled

as of June 14, 2002.  (R. 17.)  The Social Security Administration ("SSA") denied the claim

initially and again on reconsideration, following which an administrative hearing was held on

July 6, 2006.  The decision was unfavorable, following which the Appeals Council ordered the

ALJ to conduct a supplemental hearing on April 21, 2009. The ALJ issued a second unfavorable decision on June 11, 2009. (R. 17-31.) Plaintiff again appealed, but this time the Appeals Council denied his request. The ALJ's order then became the Commissioner's final decision, and Plaintiff filed the instant case seeking judicial review of it on February 24, 2010.

## II. Factual Background

### A. Medical History

Plaintiff originally injured his back in April, 2002 while lifting and emptying a fifty-five gallon water container. (R. 242.) He initially received some physical therapy in 2003 and then had several local injections to control his pain. Neither form of treatment was helpful, (R. 242-43), and in January, 2004, Plaintiff underwent an MRI on his spine as a result of complaints of low back pain that extended down through his left leg. The report shows that some bilateral spondylosis, a form of spinal arthritis, was found at the L5/S1vertebrae, as well as a posterior disc bulge and moderate bilateral foraminal narrowing. (R. 239.)

After Plaintiff filed for SSI, he was referred to Dr. M.S. Patil for an internal medicine examination on November 18, 2004. Dr. Patil noted that Plaintiff had already undergone abdominal surgery in June, 2004. (R. 240.) However, Plaintiff was not currently complaining of any rectal bleeding or bowel dysfunction. Dr. Patil's examination showed that Plaintiff's motor strength was normal in both upper and lower extremities, and no paravertibral tenderness or spasm was noted. (R. 242.) His range of motion in the spine and back was within the normal range, and no swelling or tenderness was noted in any joints. (*Id*.) Dr. Patil also found that

Plaintiff's cranial nerves were functioning properly, his reflexes were normal, and that he was walking with a cane.  (*Id.*)

As part of his disability application, SSA medical consultant Dr. Kim Chansoo issued a Residual Functional Capacity ("RFC") assessment on December 13, 2004 determining that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, and that he could sit, stand, and walk for six hours in a an eight-hour work day.  (R. 244-51.)  Dr. Chansoo noted that Plaintiff had only received conservative, non-surgical treatments for his lower back pain.  The situation changed on April 28, 2005, when Dr. Hien Dang performed a discectomy surgery on Plaintiff for a bulging lumbar disc at L5/S1.  (R. 465-66.)  Several radiology tests ensued, and a May 2, 2005 x-ray showed that Plaintiff's lumbar spine was normal and showed no signs of spondylolisthesis.[1]  (R. 321.)  A May 12 CT Scan of the lumbar spine raised other concerns. Radiologist Dr. Krishna Parameswar concluded that Plaintiff had an abnormal narrowing of the intervertebral foramen at L5/S1 that was secondary to hypertrophy of the facet joint, possibly resulting in a compression of the nerve roots.  Dr. Parameswar also stated that the study showed a marked narrowing of Plaintiff's iliac artery due to severe atherosclerotic plaque formation. (R. 317.)  Perhaps due to these conditions, a second state agency expert, Dr. Madala Vidya, concluded that Plaintiff could not walk without an assistive device.  (R. 265.)  Dr. Vidya reached a more restrictive conclusion than had Dr. Chansoo, stating that Plaintiff had no ability to balance or crawl and could stand or walk only two hours during a workday.  (R. 258-65.)

---

[1]  Spondylolisthesis is a partial dislocation of the lumbar verterbrae.  The Merck Manual 329 (18th ed. 2006).

Plaintiff was experiencing pain radiating down his legs, and several tests were done around this time to address these symptoms. Plaintiff underwent arterial Doppler studies due to the finding of an iliac artery stenosis, but the results showed a normal triphasic wave pattern in both legs. Blood flow velocities were also normal. (R. 316.) A physical exam by a vascular surgeon on June 3, 2005 showed a normal pulse in the groin, knee, feet, and ankles. (R. 313, 501.) Despite this finding, Plaintiff's treating physician, Dr. Hien Dang, concluded that Plaintiff suffered from severe vascular claudication. (R. 289.) This conclusion was part of a September 30, 2005 Disorders of the Spine Residual Capabilities Questionnaire that forms a major element of Plaintiff's current claims. Dr. Dang noted that he had been treating Plaintiff for a year and that, in addition to the vascular blockage, he also suffered from severe pain stemming from radiculopathy[2] and lumbar disc problems. According to Dr. Dang, Plaintiff had serious limitations to the extension and flexion of both his cervical and lumbosacral spine, had a limited ability to concentrate due to pain and fatigue, and also had a limited ability to lift, bend, stoop, and reach throughout the day. (R. 290.) Finding that Plaintiff's allegations of pain were credible, Dr. Dang concluded that Plaintiff did not have the ability to work even in a sedentary position for a full eight-hour day, five days a week. (*Id.*)

Plaintiff continued to receive treatment for his lower back pain over the course of the next few years, though the medical records present a disjointed picture of events that neither party has addressed. On December 8, 2005, Dr. Robert Richardson, who had assisted Dr. Dang during the discectomy surgery, performed a facet joint block on Plaintiff's L5/S1, which relieved

_____

[2] Radiculopathy is a nerve root disorder "precipitated by chronic pressure on a root in or adjacent to the spinal column." The Merck Manual 1901 (18th ed. 2006).

his lower back pain, at least temporarily. Dr. Richardson diagnosed Plaintiff as suffering from lumbar facet arthritis or spondylosis. (R. 377-78.) Plaintiff continued to seek medical help at Oak Forest Hospital through the winter and spring of 2006 although, as the ALJ noted, he failed to show up for several of his appointments in this period. (R. 386.) Unlike Dr. Dang, Dr. Richardson did not fully credit Plaintiff's allegations of pain; a treatment note dated April 28, 2006 states that Plaintiff "appeared normal when *not* seen but extreme pain behavior when observed." (R. 391.) The note also states that Plaintiff was walking with a cane. (*Id.*)

In April, 2008, the emergency department of the Oak Forest Hospital referred Plaintiff to the hospital's neurology clinic for a prolapsed lumbar disk, severe back pain, and "back clicks." (R. 462.) An MRI of the lumbar spine was conducted on June 2, 2008 that showed bilateral L5 spondylolysis without spondylolisthesis. The report notes that a posterior annular tear effaced the ventral thecal sac and abutted the nerve root sleeves. (R. 460.) L5/S1 degenerative disk disease with facet arthropathy was noted. (*Id.*) A September 3, 2008 CT scan of the head was unremarkable. (R. 453.)

In addition to Plaintiff's back and leg pain, he was also treated at various times for boils on his neck, head, and groin. He appears to have sought treatment on a number of occasions at the emergency room of Oak Forest Hospital in April and November, 2005, March and April, 2006, as well as on other dates that are not clearly indicated on the medical records and that the parties do not identify. (R. 326-34, 339, 410-13, 417, 426, 436, 445, 452.)

## B. Hearing Testimony

Plaintiff testified at both the original hearing held on July 6, 2006 and the second hearing that took place on April 21, 2009. He stated that he could sit for fifteen to twenty minutes at a time and could stand for twenty to thirty minutes. (R. 478.) He was able to reach in all directions as well as to crawl. (R. 478-79.) Plaintiff testified that he could lift from ten to fifteen pounds but that he could not do so if required to bend over. His push/pull capacity was limited to ten to fifteen pounds. (R. 480.) His ability to do so, however, was only intermittent, and he stated that it was not possible to do so throughout an eight-hour work day. (R. 485-86.) Pain limited his sleep to two or three hours a night, as did chronic diarrhea, which Plaintiff claimed required him to visit the bathroom up to fourteen times a day. (R. 486, 491.) He was taking Tylenol 3 with codeine at that time to help control his pain; he also took hot baths twice a day and lay down for much of the day as additional measures designed to deal with the pain. (R. 487-88.)

Medical expert Dr. Arthur Lorber, an orthopedic surgeon, also testified at the first hearing. Dr. Lorber stated that the May, 2005 CT scan showed that Plaintiff had facet joint disease at L5/S1, a disc bulge, and a narrowing of iliac vessels. (R. 497.) However, he disputed Dr. Dang's conclusion that Plaintiff suffered from vascular claudication, noting that tests showed normal circulation to the limbs. (R. 500-02.) Based on his review of the record, Dr. Lorber determined that Plaintiff had the residual capacity ("RFC") to lift ten pounds frequently and twenty occasionally. He could sit and stand for six hours a day on an intermittent basis and walk a total of six hours during an eight-hour work day. (R. 502.) However, Plaintiff could not climb stairs or other heights and could only occasionally bend, stoop, or kneel. (R. 503.) Dr. Lorber

further testified that there was no evidence of compression of the dural sac or disc herniation. (R. 510). Finally, Dr. Lorber explained that he placed greater weight on Dr. Richardson's April, 2006 physical determination that Plaintiff was neurologically intact than he did on radiologic evidence that Plaintiff suffered from nerve root compression.[3] (*Id.*)

Medical expert Dr. Wally Miller, also an orthopedist, testified at the second administrative hearing. Dr. Miller stated that Plaintiff had spondylosis, bulging discs, and a posterior annular tear. Like Dr. Lorber, he discounted any effacement of the thecal sac by noting that few nerves were present at the L5/S1 level. (R. 542.) The 2008 MRI noted above indicated extensive arthritis of the back, but no nerve root impairment was found by the study. (R. 544.) Dr. Miller agreed with Dr. Lorber that Plaintiff did not meet or medically equal a listing impairment. (R. 545.) He restricted Plaintiff's RFC to sedentary work, with a limited ability to sit, stand, and bend. (R. 545-46.) Plaintiff also testified briefly at the second hearing and stated that he could lift only ten pounds. (R. 548.)

**C.      The ALJ's Decision**

The ALJ determined at step one that Plaintiff had not engaged in any substantial gainful activity since his alleged onset date of June 14, 2002. He found at step two that Plaintiff suffered from the following severe impairments: degenerative disc disease, lower back pain, acute diarrhea, acute boils, chronic right arm pain, and left hand weakness. None of these impairments, however, were found at step three to meet or medically equal one of the listing

---

[3] The ALJ also took evidence at the first hearing from a vocational expert. As Plaintiff does not argue that the ALJ's decision should be reversed for reasons related to the vocational expert, the Court omits a recount of such testimony.

requirements.  The ALJ found that an opinion submitted by Plaintiff's treating physician,

Dr. Hien Dang, was not entitled to controlling weight and that Plaintiff's own testimony at the

hearings was not entirely credible.  Plaintiff was found to have the residual functional capacity to

perform sedentary work with numerous restrictions, including an occasional ability to lift/carry

ten pounds, an ability to stand and walk for two hours in an eight-hour work day, the ability to sit

for six hours a day, a limited ability to reach overhead with the right arm, and no capacity for

heights, hazards, crouching, or crawling.  Plaintiff had no past relevant work at step four.  At

step five the ALJ found that significant numbers of jobs exist in the national economy that

Plaintiff could perform.  As a result, the ALJ concluded that Plaintiff was not disabled.  (R. 21-

29.)


### III.   Standard of Review

Judicial review of the ALJ's decision is governed by 42 U.S.C. § 405(g), which provides

that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive."   Substantial evidence is "such evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402

U.S. 389, 401 (1971).  The court reviews the entire record, but does not displace the ALJ's

judgment by reweighing the facts or by making independent credibility determinations.  *Elder v.

Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the court looks at whether the ALJ

articulated an "accurate and logical bridge" from the evidence to her conclusions.  *Craft v.

Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  Thus, even if reasonable minds could differ whether

the Plaintiff is disabled, courts will affirm a decision if the ALJ's decision has adequate support. *Elder*, 529 F.3d at 413 (citing *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

## IV.   Discussion

Plaintiff argues that the ALJ erred on three grounds: (1) he failed to properly evaluate the opinion given by treating physician Dr. Dang; (2) he erred in finding that Plaintiff's own testimony was not entirely credible; and, (3) his RFC assessment failed to consider how Plaintiff could work in light of his claimed limitations.

### A.      The Treating Physician Issue

A treating physician's opinion is entitled to controlling weight when it is supported by the objective medical record and is not inconsistent with other substantial evidence. 20 C.F.R. § 414.1527(d)(2); *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). Even when an ALJ finds that a treating physician's report is not entitled to controlling weight, the ALJ may not simply reject the report or opinion out of hand. SSR 06-2p. Instead, he must determine the weight that should be assigned to the report by discussing the length, nature, and extent of the treating relationship; the supporting evidence in the record; the consistency of the opinion with the record, and the physician's medical speciality. 20 C.F.R. § 404.1527(d). Social Security Ruling 96-2p makes clear that "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p. Whatever his decision, the ALJ must provide "good reasons" for his decision. 20 C.F.R. § 404.1527(d)(2).

The ALJ here found that the report of Dr. Dang, Plaintiff's treating physician, was not entitled to controlling weight. The Commissioner argues that the ALJ properly discounted the report because it included opinions on issues that are reserved to the Commissioner. Dr. Dang's report stated, for example, that Plaintiff was not able to work in a sedentary occupation, a finding that would essentially require a conclusion that he was disabled. (R. at 27, 290.) The Commissioner's argument is correct on this point because disability findings are exclusively within the Commissioner's domain. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) ("[T]he Commissioner is charged with determining the ultimate issue of disability.").

Notwithstanding, the report also contains numerous other findings concerning Plaintiff's symptoms, aggravating factors, his ability to push, pull, and bend, as well as the flexion and extension limits of his lumbosacral and cervical spine. (R. 289-90.) These are areas of medical expertise in which a physician is permitted to give an opinion. *See* 20 C.F.R. § 404.1513(c)(1) (allowing "acceptable medical source's opinion about your ability, despite your impairment(s), to do work-related activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking and traveling[.]"). The fact that some portions of Dr. Dang's report involved matters reserved for the Commissioner is not a ground for rejecting other issues that were within Dr. Dang's medical expertise. *See McMurtry v. Astrue*, 749 F. Supp.2d 875, 888 (E.D. Wis. 2010) ("A treating physician's opinion may have several points; some may be given controlling weight while others may not."). Indeed, even if all of Dr. Dang's conclusions were exclusively within the Commissioner's domain, the report could not be overlooked on that basis alone. *See* SSR 96-5p ("[O]pinions from any medical source on issues reserved to the Commissioner must never be ignored.").

Perhaps recognizing this fact, the ALJ discounted the treating physician's report primarily based on two other factors: a finding that the report was not consistent with the record as a whole and Dr. Dang's medical specialty. (R. 27.) The ALJ provided no record citations for the first finding, stating only that substantial medical evidence did not support the opinion. (*Id*.) In other portions of his decision, however, the ALJ recounted medical evidence that he believed worked against Plaintiff's credibility, and the Commissioner argues that this general review of the record provides substantial evidence that the ALJ was not required to give controlling weight to Dr. Dang's report. (Resp. at 8.) The Court agrees with the Commissioner on this issue because the ALJ noted a number of conflicts between Dr. Dang's report and statements made by other medical sources. For example, the testifying medical experts, Dr. Lorber and Dr. Miller, disputed Dr. Dang's finding that Plaintiff suffered from severe arterial claudication and reached a number of other contrary conclusions about Plaintiff's condition. Social Security Ruling 96-2p states that a treating physician's report is not well-supported when it is inconsistent with another medical source's opinion on the same issue. SSR 96-2p.

Plaintiff's argument, however, is broader than a claim that the ALJ was incorrect in denying controlling weight to Dr. Dang's report. He contends that the ALJ erred in not giving any specific weight to the report at all. The ALJ stated that, based on the record and Dr. Dang's specialization, his report "has not been given that degree of weight that might otherwise be given to the treating physician in a disability adjudication." (R. 27-28.) On its face, this language does not make clear whether the ALJ gave some, little, or no weight to Dr. Dang's report. The Commissioner contends that the Court can infer from the ALJ's decision that he gave no weight to it. (Resp. at 8.) This argument overlooks that an "ALJ's decision cannot leave the weight given

to the treating physician's testimony to mere inference: the decision must be sufficiently specific to make clear to any subsequent reviewers the weight the ALJ gave to the treating source's medical opinion and the reasons for that weight." *Ridinger v. Astrue*, 589 F. Supp.2d 995, 1006 (N.D. Ill. 2008); *see also Moore v. Astrue*, No. 08 C 5180, 2010 WL 2166629, at *8-9 (N.D. Ill. May 27, 2010). Here, the ALJ may have given Dr. Dang's report some, but not controlling, weight and still have decided not to adopt its findings. He may also have simply rejected it altogether, as the Commissioner contends. As any inference on this topic is speculative, the ALJ did not comply with the standard set out in SSR 96-2p. *See* SSR 96-2p (stating that an ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."); *see also* 20 C.F.R. § 404.1527(d) ("[W]e will evaluate every medical opinion we receive.").

Insofar as the Commissioner is correct, and the ALJ rejected Dr. Dang's report, Plaintiff argues that the ALJ still erred because he failed to weigh the report using the factors that govern a treating source's opinion. Social Security Ruling 96-2p states that even when they are not given controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors" required under the regulations. SSR 96-2p. These include the nature, length, and extent of the treatment relationship, the physician's specialty, and the consistency and support that exist between the opinion and the record. Other than the general record, the ALJ here relied only on Dr. Dang's medical specialty. The ALJ surmised from the testimony of a medical expert (apparently Dr. Lorber) that Dr. Dang was a neurologist and concluded based on this assumption that "his opinions regarding the nature and severity of the claimant's back condition exceed the scope of his expertise." (R. 27.) *See* 20 C.F.R.

§ 416.927(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her of specialty than to the opinion of a source who is not a specialist.").

Plaintiff argues that the ALJ's conclusion that Dr. Dang had no expertise to assess his back pain was misguided because Dr. Dang helped to treat Plaintiff's ongoing pain. For his part, the Commissioner does not address Dr. Dang's qualifications as a neurologist, claiming instead that the ALJ properly relied on Dr. Lorber's testimony that he was not an orthopedic surgeon. Both of these arguments fail to address the more fundamental problem at issue here – the foundation for assuming that Dr. Dang was a neurologist at all. Contrary to the ALJ's statement, no medical expert testified that was the case. In fact, Dr. Lorber repeatedly denied it. Plaintiff's attorney told Dr. Lorber that he believed Dr. Dang was a neurosurgeon, a suggestion that Dr. Lorber vigorously denied: "I don't believe that he's a neurosurgeon. I think he's an anesthesiologist or something. He works in the pain clinic, and I do not believe that he is either an orthopedic surgeon . . . or a neurosurgeon. I believe he's maybe what they call an interventional anaesthesiologist or perhaps a physical medicine and rehabilitation physician. . . . But I'm fairly confident that he's neither an orthopedist or [a] neurosurgeon." (R. 505.) In other words, Dr. Lorber did not know with any certainty what kind of specialist Dr. Dang was, and the ALJ had no basis from this testimony to conclude that he was a neurologist.

Neither party cites any relevant evidence in the record showing whether the ALJ was correct or incorrect in guessing at Dr. Dang's specialty, and the Court has no basis on which to determine whether Dr. Dang was a surgeon, neurosurgeon, neurologist, or an orthopedic surgeon. Notably, neither the ALJ nor Dr. Lorber gave any indication that they were aware of the fact that Dr. Dang himself performed the discectomy surgery on Plaintiff in April, 2005. (R. 465.)

Presumably, Dr. Dang was qualified to perform such an operation. Even if he was a neurologist, as the ALJ assumed, the record does not suggest that he lacked the expertise to give an opinion on Plaintiff's back pain, which involved issues related to nerve compressions and nerve roots.[4] At a minimum, the ALJ was required to explain how a physician like Dr. Dang who diagnoses a patient with a bulging disc and performs surgery to remedy that problem is not qualified to give a medical opinion on the nature and severity of his patient's condition.

This oversight, combined with the ALJ's failure to adequately consider the factors involved in weighing a treating physician's report, was erroneous. An ALJ is not required to provide detailed explanations why each of the factors applicable to a physician's report applies. *Ellis v. Barnhart*, 384 F. Supp.2d 1195, 1203 (N.D. Ill. 2005). Nevertheless, an ALJ must still minimally articulate his assessment of the evidence so that a court can follow the path of his reasoning. *Scott v. Barnhart*, 291 F.3d 598, 595 (7th Cir. 2002); *Elder*, 529 F.3d at 415 (stating this is "a very deferential standard that we have, in fact, deemed lax.") (internal quotes and citations omitted). Here, the ALJ overlooked important issues concerning Dr. Dang's specialty and did not provide a specific weight to his report. For these reasons, Plaintiff's motion is granted on this issue.

B.      The Credibility Issue

---

[4] Although not immediately relevant here, the Court notes that the ALJ's decision relied on other medical evidence concerning Plaintiff's neurological condition without considering the physician's specialty. For example, the ALJ's RFC and credibility analysis relied on a report by Dr. Patil that Plaintiff was "neurologically intact," even though Dr. Patil's specialty was family and emergency medicine. (R. 28, 243.)

Plaintiff further argues that the ALJ erred by finding that his statements concerning the limiting effects of his pain and other symptoms were not entirely credible. The Court reviews an ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses." *Craft*, 539 F.3d at 678. An ALJ's credibility determination warrants reversal only if it is so lacking in explanation or support that it is "patently wrong." *Elder*, 529 F.3d at 413-14. An ALJ should consider the entire case record and give specific reasons for the weight given to an individual's statements. SSR 96-7p. Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received, medication taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). Social Security Ruling 96-7p requires an ALJ to consider seven factors in making a credibility decision: (1) activities of daily living; (2) the duration and intensity of pain or other symptoms; (3) factors that precipitate or aggravate symptoms; (4) issues related to medication; (5) non-medication treatment the claimant has received; (6) non-treatment measures a claimant has taken to alleviate pain, such as standing or moving in certain ways; and, (7) other factors affecting an individual's functional limitations and restriction due to his symptoms. SSR 96-7p.

Plaintiff first argues that the ALJ erred by finding that his statements at the hearing were not credible "to the extent that they were inconsistent with the above residual capacity assessment." (R. 25.) The Seventh Circuit has rejected such commonly-used language in cases of this kind as boilerplate, and if the ALJ had left the matter in this state, his language would constitute reversible error. *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003). But the ALJ's decision also contains a discussion of at least some of the seven factors

required by SSR 96-7p and does not rely merely on the words Plaintiff cites. Whether that discussion is sufficient to support the credibility determination requires further examination, but the language Plaintiff relies on is not, in itself, a ground for finding that the ALJ erred.

Turning to the seven factors themselves, the first requires an ALJ to consider a claimant's activities of daily living. When, as here, an ALJ finds that subjective complaints of pain are not fully supported by the record, he "must obtain detailed descriptions of [a] claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant." *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994). The ALJ in this case did not do so in any meaningful detail at either of the two administrative hearings. Plaintiff does not argue that the ALJ erred in this matter, but the Court notes several concerns surrounding the ALJ's discussion of this issue. The ALJ discounted Plaintiff's few statements concerning his inability to perform daily tasks based on a health intake form dated April 7, 2006. (R. 388.) The form appears to have been part of Plaintiff's visit to a clinic for the treatment of influenza, and it contains checkmarks indicating that Plaintiff stated both that he was able to perform his activities of daily living and that pain did not regularly interfere with his tasks. (R. 388.) The ALJ was entitled to cite this form, but it is unclear what activities Plaintiff understood to be referred to by it; they may or may not have been as extensive as the kind of daily acts the ALJ should have enquired about at the hearing. The Court notes that the fact that a claimant can undertake minimal daily activities does not, in itself, undermine a claim of disabling pain. *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Moreover, the April, 2006 form preceded the second hearing by over three years, and the ALJ did not attempt to determine if Plaintiff's condition had changed in the interim. *See* SSR 96-7p

(requiring an ALJ to consider the longitudinal record because pain symptoms can worsen or improve over time).

The second factor concerning the duration, frequency, and intensity of Plaintiff's symptoms is more problematic. The ALJ briefly noted Plaintiff's allegations of pain and exertional restrictions, and he then devoted two paragraphs to the topic of Plaintiff's boils. This discussion constitutes the largest single element of the ALJ's credibility discussion. Two conclusions were reached: (1) Plaintiff may have intentionally manufactured his boils by lying down frequently before scheduled disability hearings, and (2) the medical evidence showed that this condition did not meet the durational requirement of a condition that was expected to last more than twelve months.[5] (R. 26.) Plaintiff argues that this analysis was erroneous. The Commissioner contends that, even if the ALJ was incorrect, his discussion only constitutes harmless error. (Resp. at 10.)

The Court agrees that the ALJ's discussion of Plaintiff's boils was flawed, but the error involved in this matter poses considerably more harm than the Commissioner allows. By suggesting that Plaintiff intentionally brought his boils on himself by lying down when he knew a disability hearing was on the horizon, the ALJ implied that Plaintiff was not only malingering, he was also actively interfering with the integrity of the administrative processes that apply to his alleged disability. The Court finds it difficult to understand how this does not go to the heart of

---

[5] Although it is not clear how the second finding is relevant to Plaintiff's credibility, the ALJ's conclusion contradicts his own prior determination of this issue. A claimant can only move beyond step two by showing that he has an impairment that "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. §§ 416.909 & 416.920(a)(4)(ii). As the ALJ found that Plaintiff's boils satisfied the requirements of a severe impairment at step two (R. 21), he necessarily determined at that stage that Plaintiff satisfied the durational requirement that the ALJ claimed in his credibility analysis was not met.

his credibility. That is particularly the case here because the ALJ's discussion touches on one of the central components of Plaintiff's allegations concerning his pain. Plaintiff testified that lying down was a principal means for controlling his pain and that he did so "most of the day." (R. 488.) The ALJ linked Plaintiff's self-inflicted boils to this need to lie down frequently. (R. 26.) By suggesting that Plaintiff did so primarily when a hearing was approaching, however, the ALJ implicitly discredited Plaintiff's testimony that his motive for lying down was to ease his pain.

No medical evidence supports the ALJ's analysis of this issue. Neither the ALJ nor the Commissioner has cited any evidence suggesting that Plaintiff's boils were caused by the frequency of his rest periods. Neither Dr. Lorber nor Dr. Miller testified on this issue at the hearings. Plaintiff was treated on several occasions for boils on his head, neck, and groin, and none of the medical records related to those treatments support the ALJ's speculation as to the cause or purpose of Plaintiff's condition. *See* SSR 86-8 (stating that "presumptions, speculations and suppositions should not be substituted for evidence.").

Instead of evidence, the ALJ's speculation stemmed from his own attempt to link up Plaintiff's treatment dates with scheduled hearing dates. (R. 26.) As Plaintiff correctly points out, however, these hardly form a direct relationship with one another. For example, Plaintiff had a hearing scheduled on October 22, 2008, but he was treated for boils in April, June, July, August, and October of 2008. (Plt's. Mot. at 9.) He was also treated in February, 2009, a month after his January, 2009 hearing. (*Id*.) The medical record clearly shows that Plaintiff's condition was painful; one treatment note, for example, states that "pus and blood drained out" of the boils. (R. 413.) The ALJ provided no explanation of why Plaintiff would have created such a trying condition for a full seven months prior to the October, 2008 hearing and would have continued to

do so after his January, 2009 date. *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (noting the improbability that a claimant would undergo extensive treatment merely to increase the chances of obtaining benefits).

It is clear that the ALJ relied on his own inferences in lieu of medical evidence to hypothesize on both the cause and motive for Plaintiff's boils – findings that constitute independent medical conclusions of a particularly troubling nature. Such determinations are prohibited because it is well established that ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings." *Clifford*, 227 F.3d at 870; *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (citing cases). While it is true that an ALJ has the ultimate responsibility for determining disability, this obligation does not entitle him to reach medical conclusions on his own. *See Williams v. Apfel*, 48 F. Supp.2d 819, 825-26 (N.D. Ill. 1999). "The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). An ALJ's substitution of his own medical judgment, together with a disregard of relevant medical evidence, warrants reversal. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (citing cases).

Unfortunately, the ALJ's error did not end with Plaintiff's boils. He made the same error by interpreting Dr. Dang's April 28, 2005 surgery report to discount Plaintiff's allegations on the severity of his pain. The report indicates that Dr. Dang performed both a discectomy and a discogram on Plaintiff at the L5/S1 region. For reasons that are unclear, the ALJ stated that "no concordant pain [was shown] when an L5/S1 discogram was performed," and he concluded that "[t]his is very significant because the discogram procedure is designed to invoke pain when there

is, in fact, a compression of a nerve root." (R. 23.)   The ALJ had no expertise to make such a medical conclusion.  Neither of the two medical experts testified as to the purpose or nature of a discogram, and the ALJ cited no evidence that supports his evaluation of what a discogram is, the different reasons why a surgeon might use it, or how (or why) it was applied to Plaintiff by Dr. Dang.  Moreover, Dr. Dang's surgical report, which was completed by Dr. Richardson, does not make any statement as to whether pain was or was not "invoked" during the surgery, nor does it provide any ground for assuming that the test was designed to do so.  It is clear from the report that the discogram was secondary to the partial removal of a bulging disc at L5/S1, that Plaintiff was anesthetized with intravenous sedation, and that the entire procedure was designed to relieve him of the pain he was experiencing at that level.  (R. 465.)  Whether a discogram can be used under these conditions in the way the ALJ assumed, or whether that assumption has any relevance to what Dr. Dang was attempting to accomplish, was pure speculation by the ALJ.  Accordingly, the ALJ's conclusion that Plaintiff's allegations of pain should be discredited on this basis is clear error.

The ALJ noted Plaintiff's pain medications,[6] but his brief discussion of the third issue concerning precipitating and aggravating factors returned once again to improper medical conclusions.  The ALJ did not question Plaintiff on this topic or note that Plaintiff stated that moving his legs aggravated the pain he claimed extended from his lower back to his feet.  Instead, the ALJ somewhat enigmatically concluded on this topic that Plaintiff smoked one-half to a pack of cigarettes a day.  (R. 26.)  The Commissioner does not point to any record evidence supporting

---

[6]  The ALJ incorrectly stated that at the time of the decision Plaintiff was taking Tylenol 3 to control his pain.  The record shows that he became intolerant to it and that it had been replaced with Tramedol.  (R. 426, 450.)

a finding that smoking aggravated any of the severe conditions found by the ALJ – back pain, diarrhea, boils, arm pain, and left-hand weakness – or that it related in any way to the credibility of Plaintiff's testimony concerning his pain. As such, the Court can only conclude that, as before, the ALJ improperly made an independent finding that smoking was a precipitating factor for Plaintiff's medical conditions.[7]

Finally, the ALJ also considered two additional factors that weighed against the credibility of Plaintiff's testimony. First, he found that Plaintiff missed several follow-up medical appointments and hypothesized that this could have happened because Plaintiff complained to the neurology clinic that "they are not doing anything for me." (R. 399.) A claimant's failure to follow through with treatment is a factor in assessing his credibility. SSR 96-7p. Here, however, the ALJ construed the evidence against Plaintiff without considering favorable factors that are evident from the record. For example, Plaintiff actually kept his appointment immediately following the remark cited by the ALJ, and not all the missed appointments were for pain treatments. (R. 386-93, 399.) He did miss a December 6, 2005 appointment, but received a facet joint block two days later at Oak Forest Hospital to alleviate his back pain. (R. 377-78.) Without additional explanatory evidence, one could speculate just as readily from this fact that Plaintiff missed his December 6 appointment *because* of pain, not due to a lack of it. Moreover, treatment notes show that Plaintiff was suffering from influenza in April, 2006, a fact that could have contributed to his missed appointments during this period. (R. 392-93.) If the ALJ believed that

---

[7] The significance of the ALJ's finding on this point is unclear. The ALJ stated that he limited Plaintiff's work to minimal exposure to chemicals, dust, and fumes. (R. 26.) However, neither the testifying medical experts nor the state agency consultants recommended such restrictions.

Plaintiff's behavior was evidence that his pain was not as great as he claimed, the ALJ should have inquired into the matter. *See Craft*, 539 F.3d at 679 ("[T]he ALJ must not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care.") (internal quote and citation omitted); *see also* SSR 96-7p ("The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.").

The ALJ also relied on a comment in Dr. Richardson's April 28, 2006 treatment note stating that "[g]ait appears normal when *not* seen but extreme pain behavior when observed." (R. 391) (emphasis in original). Great weight was placed on this observation both in the first hearing, where it arose several times, and the ALJ's decision, which used Dr. Richardson's note to discredit Plaintiff's allegations of pain. (R. 27.) The ALJ was clearly permitted to consider this note in his credibility analysis, but he was also required to consider all the evidence, including those parts of the record that support Plaintiff's claims. *See* SSR 96-7p. Dr. Richardson's note does suggest that Plaintiff was exaggerating his symptoms, but it did not say, as the ALJ incorrectly stated, that "claimant gave no outward signs of pain."[8] (R. 27.) Without giving any specific weight to Dr. Dang's opinion, moreover, it is not clear how the ALJ balanced Dr. Dang's conclusion that Plaintiff's complaints were credible against Dr. Richardson's suggestion that they

---

[8] Dr. Richardson noted that Plaintiff was using a cane, and insofar as the ALJ inferred that he did not need to use it to walk, he failed to cite any supporting evidence. It is undisputed that a physician prescribed the cane to Plaintiff; Plaintiff testified on this issue at the hearing, and Dr. Patil noted the same fact in his report. (R. 242.)

were not.  Both physicians knew Plaintiff well, and Dr. Richardson assisted Dr. Dang in

performing Plaintiff's discectomy.  (R. 465-66.)  Dr. Richardson's note also preceded the ALJ's

decision by over three years.  However, the ALJ took little notice of Plaintiff's continuing efforts

after the first hearing to seek treatment for his pain other than by noting the results of a 2008

MRI.  He overlooked, for example, that a second facet joint injection was recommended on

October 10, 2008, and was scheduled for December 24, to alleviate Plaintiff's continuing back

pain.  (R. 409, 452.)  Social Security Ruling 96-7p stresses that symptoms of pain can worsen or

improve over time, and an ALJ must consider whether the evidence in the longitudinal record

"lends support to an individual's allegations of intense and persistent pain . . . for the purposes of

judging the credibility of the individual's statements."  SSR 96-7p.

       An ALJ is not required to consider every piece of evidence in the record, *Terry v. Astrue*,

580 F.3d 471, 475 (7th Cir. 2009), but she "must investigate all avenues presented that relate to

pain[.]" *Luna*, 22 F.3d at 691.  The ALJ's failure to do so here, and particularly his improper

medical conclusions, do not accord with an ALJ's obligation to make the basis of his assessment

clear or to "build a logical bridge between the evidence and his conclusion."  *Villano v. Astrue*,

556 F.3d 558, 562 (7th Cir. 2009).  For these reasons, Plaintiff's motion is granted on the

credibility issue.


       C.      **The RFC Issue**

       Finally, Plaintiff argues that the ALJ erred in his RFC assessment that he could perform

sedentary work.  The ALJ found that Plaintiff could lift/carry ten pounds; sit for six out of eight

hours a day with normal breaks; walk and stand for two hours each day; and had an unlimited

ability to push and pull.  (R. 24.)  In support, the ALJ stated that he had considered all of Plaintiff's symptoms and their consistency with the medical record and had also considered the medical opinion evidence.  The ALJ also noted as part of his credibility determination that the two testifying medical experts agreed that Plaintiff could perform sedentary work.  (R. 29.)

Social Security Ruling 96-8p states that a "RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."  SSR 96-8p.  Merely acknowledging such complaints does not meet this standard.  An ALJ must articulate the reasons on which they are rejected.  *See Myles v. Astrue*, 582 F.3d 672, 676-77 (7th Cir. 2009).  According to Plaintiff, the ALJ failed to meet this standard when he did not address why Plaintiff's need for hot baths and rest periods, as well as his impairments in concentration, were inconsistent with the record.

The Court agrees with this analysis of the ALJ's decision.  The Commissioner contends that the ALJ was not required to provide the explanations Plaintiff seeks because he reasonably concluded that Plaintiff's testimony was not credible.  (Resp. at 10.)  As noted above, however, the ALJ's assessment of Plaintiff's subjective complaints of pain was seriously flawed.  By failing to properly address Plaintiff's alleged need to lie down for long periods, the ALJ violated SSR 96-8p's mandate that he either discuss why Plaintiff's subjective complaint did not accord with the objective record or explain how any conflict between Plaintiff's complaint and the record had been resolved.  The ALJ did acknowledge that Plaintiff needed to take hot baths twice a day to ease his pain and that his pain made it difficult to focus or stay on task.  (R. 25, 27.)  He gave no indication as to whether he found these claims credible or not, and neither the testifying medical experts nor the state agency experts made any finding concerning either issue.  If they were

credible, then the ALJ was required to explain how Plaintiff could carry out the job-related duties the ALJ found him capable of; if they were not credible, the ALJ was obligated to explain how he resolved inconsistencies between the record and Plaintiff's complaints. *Myles*, 582 F.3d at 676-77. The ALJ's failure to properly assess Plaintiff's claimed need to lie down for most of the day also precludes a correct analysis of how he was able to perform sedentary work in light of that claimed limitation.

The Commissioner contends that any error was essentially harmless because the ALJ limited him to sedentary work. (Resp. at 9.) Without a proper assessment of the credibility of Plaintiff's subjective complaints, such as his need to lie down for most of the day, it is not clear that Plaintiff could perform such work. The Commissioner also correctly notes that the restrictions included in the ALJ's RFC were supported by the consulting and testifying experts. Plaintiff's point, however, is that there are additional restrictions that the ALJ did not consider and that were not reviewed by the experts. An ALJ's failure to explain how he arrived at his exertional conclusions under SSR 96-8p is "in itself sufficient to warrant reversal of the ALJ's decision." *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). It is an ALJ's responsibility to weigh the evidence and to resolve any ambiguities or inconsistences in it. *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000). As the ALJ's RFC analysis depended, in large part, on his flawed assessment of Plaintiff's credibility, and did not explain how Plaintiff's reported limitations were consistent or inconsistent with the record, the RFC analysis is improper. *See Fischer v. Barnhart*, 256 F. Supp.2d 901, 909 (E.D. Wis. 2002) (rejecting an RFC analysis when it is based on a flawed credibility determination). Accordingly, Plaintiff's motion is granted on this issue.

### V.   <u>Conclusion</u>

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 18] is granted.  Accordingly, the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

**Dated:**  June 24, 2011.